ABENDSCHEIN v. FARRELL.

OPINION OF THE COURT.

1. AUTOMOBILES—NEGLIGENCE—GROSS NEGLIGENCE—ONTARIO—STATUTES.

The Ontario highway traffic statute applicable to an accident occurring in the Province of Ontario in 1965 barred as a matter of law any action based on the gross negligence of the driver (Ont Rev Stat [1960], chap 172, § 105).

---

REFERENCES FOR POINTS IN HEADNOTES

[1–3, 5, 6] 8 Am Jur 2d, Automobiles and Highway Traffic § 466.
  Choice of law in application of automobile guest statutes. 95 ALR 2d 12.
[4] 20 Am Jur 2d, Courts § 184.
[7, 8] 1 Am Jur 2d, Actions §§ 22–27.
[9] 27 Am Jur 2d, Equity §§ 120, 121.

2. SAME—NEGLIGENCE—LEX LOCI DELICTI—STARE DECISIS—GROSS NEGLIGENCE.

> Prior decision of this Court upholding the application of the law of the place where the wrong occurred is absolutely controlling of an action in this State against defendant driver and owner for gross negligence in the operation of a motor vehicle in Ontario.

3. SAME — GUEST PASSENGER — NEGLIGENCE — STARE DECISIS — LEX LOCI DELICTI.

> *Stare decisis* is a rule which the courts must follow unless there is an undeniably better rule; thus where plaintiffs of New York form a guest-host relationship with a domiciliary of Michigan, who is the lessee of an automobile which is owned, licensed, leased, and presumably insured in Michigan, the court will not adopt the dominant contact approach upon occurrence of an automobile accident in Ontario; instead, when this State is the forum, the previously applied rule that the law of the place of the wrong controls will be applied.

4. COURTS—STARE DECISIS.

> *Stare decisis* is usually the wise policy because in most matters it is more important that the applicable rule of law be settled than that it be settled right, especially where the error can be corrected by legislation.

5. AUTOMOBILES—NEGLIGENCE—LEX LOCI DELICTI—CHANGE OF LAW —LEGISLATIVE CHANGE—JUDICIAL DECISION.

> Repudiation of the rule of *lex loci delicti* which is followed in this State and applied to actions at law for damages arising out of motor car accidents should be made only by legislative measure based upon declared policy, conditions, and qualifications, not by judicial decision allowing a trial judge to make discretionary choices.

6. SAME—NEGLIGENCE—DOMINANT CONTACT—LEX LOCI DELICTI.

> The dominant contact approach adopted by other States in actions at law for damage arising out of motor car accidents in the nonforum State will not be followed in this State because such an approach does not make the law of torts more uniform nor is there an overriding consideration of public policy which justifies or directs this change in Michigan-established rule of *lex loci delicti* or makes advisable the confusion which a change would introduce.

7. Action on the Case—Interpretation.

> Action on the case as adopted by the Supreme Court has been defined to mean that whenever law gives a right or prohibits an injury, it will afford a remedy; hence, where there has been an injury for which none of the established forms of action lie, an action on the case will lie, notwithstanding that there is no precedent for the particular action.

8. Judgment—No Cause of Action—Remedy—Action on the Case.

> Judgment of no cause of action should not be granted against plaintiffs of New York who bring an action for negligence as passengers of an automobile which was being driven by a domiciliary of Michigan, when the host-guest relationship arose in New York and the automobile involved was leased and licensed in Michigan, until the lease has been examined by the court, and it has been ascertained whether plaintiffs have some remedy against either the driver-lessee or the lessor, and if no remedy is available they must be given a fair chance to seek possible permissible action on the case.

9. Action on the Case—Remedy Available.

> Complete lack of remedy established by plaintiff as against defendant who caused grievous wrong should afford plaintiff a compensatory day in court by resort to the common-law tenet, "no wrong without a remedy".

Appeal from Court of Appeals, Division 1, Levin, P. J., and J. H. Gillis and Quinn, JJ., affirming Wayne, Neuenfelt (Lila M.), J. Submitted May 9, 1969. (Calendar No. 22, Docket No. 52,102.) Decided September 3, 1969.

11 Mich App 662, affirmed.

Complaint by Earl Abendschein, for himself, as executor of the estate of Leona Abendschein, deceased, and as guardian of Darrell Abendschein, a minor, and by Paul Kanter, as guardian of Penny Lipsitz, a minor, against Robert Farrell and Dietrich

Leasing Incorporated, a Michigan corporation, for damage for wrongful death and personal injuries in an automobile accident. Judgment for defendants. Plaintiffs appealed to the Court of Appeals. Affirmed. Plaintiffs appeal. Affirmed.

*Charfoos & Charfoos,* for plaintiffs.

*Alexander, Buchanan & Conklin (Arnold N. Magnuson,* of counsel), for defendant.

BLACK, J. When Mr. Sherwood's excellently presented commentary, *"Babcock* v. *Jackson:* The Transition from the Lex Loci Delicti Rule to the Dominant Contacts Approach" was published 5 years ago in the Michigan Law Review (Vol 62, No 8, pp 1358–1375), it soon became evident that an early motion would be made in this Court to overrule *Kaiser* v. *North* (1939), 292 Mich 49, and all Michigan counterparts thereof. The regularly followed and much shorter motor route from southeastern Michigan, across Ontario toward New York State and the lower New England States, stimulated much of the ensuing professional and institutionary discussion. So did the then Ontario statute (quoted *post* with 1966 amendment) which denied recovery in cases as at bar.

The predicted motion is here upon grant of leave to review *Abendschein* v. *Farrell* (1968), 11 Mich App 662. It arises out of an ill-fated motor trip which started in 1965 at Buffalo. The intended destination was Detroit. The intended route led across Ontario. The motorcar and its occupants came to grief in Ontario.

One motorcar only was involved. It was licensed in Michigan, owned by the defendant Dietrich Leasing, Inc., of Wayne, Michigan, and driven at the

time by defendant Robert Farrell, a resident of Michigan. Farrell, presumably lessee of the car, was accompanied by 3 guest passengers. Two are plaintiffs. One was fatally injured. All 3 were residents of New York State. The motorcar, according to plaintiffs' accepted-as-true complaint, was driven by Farrell "at speeds of 90 miles per hour around curves while intoxicated" with result that it finally "rolled over several times." For further details, see the majority opinion of Division 1, cited above.

All actions set forth in the complaint allege gross negligence on the part of defendant Farrell. They were and yet are barred as a matter of law by an Ontario statute as that statute stood in 1965,[1] unless plaintiffs' motion to overrule is due for grant retroactive to and including May 31, 1965, the date of plaintiffs' misfortune, or unless this Court decides to treat plaintiffs' complaint as presenting an action

---

[1] Section 105 of Ontario's highway traffic statute, cited in *Abendschein* (*supra* at 665), was amended effective January 1, 1967. The amendatory section (20) reads:

"20. — (1) Section 105 of *The Highway Traffic Act* is amended by adding thereto the following subsection:

"(1a) Where a motor vehicle is leased, the consent of the lessee of the motor vehicle to the operation or possession thereof by some person other than the lessee shall, for the purposes of subsection 1, be deemed to be the consent of the owner of the motor vehicle.

"(2) Subsection 2 of the said section 105 is amended by adding at the end thereof 'except where such loss or damage was caused or contributed to by the gross negligence of the driver of the motor vehicle', so that the subsection shall read as follows:

" '(2) Notwithstanding subsection 1, the owner or driver of a motor vehicle, other than a vehicle operated in the business of carrying passengers for compensation, is not liable for any loss or damage resulting from bodily injury to, or the death of any person being carried in, or upon, or entering, or getting on to, or alighting from the motor vehicle, except where such loss or damage was caused or contributed to by the gross negligence of the driver of the motor vehicle.'

"(3) Subsection 2 applies only to loss or damage resulting from bodily injury to, or the death of any person caused by the gross negligence of a driver of a motor vehicle on or after the day subsection 2 comes into force." (Revised Statutes of Ontario, Canada, 1966, Chapter 64, p 250).

on the case within the authorities cited in *B. F. Farnell Company* v. *Monahan* (1966), 377 Mich 552, 555, 556. For discussion of this last point, see the writer's separate opinion, *infra* at 524.

To support their motion to overrule, plaintiffs insisted that the new "dominant contacts approach" calls for application to these actions of the liability law of New York or the liability law of Michigan, one or the other. As against that motion defendants moved for summary judgment. The motion was granted. On appeal the circuit court's judgment was affirmed. Division 1 ruled that the *lex loci delicti* must control in the absence of overrulement as sought by plaintiffs.

One need but read once all three of the painstaking opinions below to perceive that these tort-sounding cases should be dubbed *lex* v. *lex* and *lex.* The circuit judge ruled rightfully that *Kaiser* v. *North, supra,* was "absolutely controlling."[2] Two members of the appellate panel stood for application to the pleaded facts of New York's law of liability as determined in *Babcock* v. *Jackson* (1963), 12 NY2d 473 (240 NYS2d 743, 191 NE2d 279, 95 ALR2d 1) and like "significant contacts" cases cited in Judge J. H. GILLIS' opinion. The third member remained on more cautious ground, that of insistence upon an evidentiary trial before any Michigan court should undertake summary departure from our rule *lex actus* to any new legal ground.

So far as concerns these factually unprecedented cases, in which—having made the "approach"—we

---

[2] Plaintiffs' counsel candidly concede this. They say, in their brief:

"For the last 70 years, the doctrine of *lex loci delicti* has been given automatic application in the appellate decisions of this State.

"The earliest record case is *Wingert* v. *Wayne Circuit Judge* (1894), 101 Mich 395. This was followed by *Turner* v. *St. Clair Tunnel Co.* (1897), 111 Mich 578."

find the domicile of plaintiffs and origin of the host-guest relationship in New York State tugging for preponderance over (a) Michigan ownership, licensing, leasing, and, presumably, insuring of the defendant Dietrich's motorcar, and (b) the Michigan domicile of both defendants, our preference is application to such cases of the rule which *Turner* v. *St. Clair Tunnel Co.* (1897), 111 Mich 578 through *Griggs* v. *Griggs* (1965), 374 Mich 268, have repeatedly applied.

That rule has been settled unanimously, understood thoroughly, and thought to be as fair to all affected thereby as man might reasonably conceive unless, of course, we are to make equity causes out of law actions. In a word, the law applicable to the presently reviewed question is the rule *stare decisis,* a rule all of us are supposed to follow save only when persuasion leads to abiding conviction that some undeniably better rule is available for proper supersession. There is no such persuasion, since the quagmire of unanswered and perceivably unanswerable questions arising out of the proposed new doctrine appears less attractive than our admittedly hard and fast—and occasionally unjust, it is true—rule that the law of the place of the wrong is applied when the forum is a Michigan court.[3]

We start out guided by "the wise policy" about which Mr. Justice Brandeis wrote eloquently when, dissenting in *Burnet* v. *Coronado Oil & Gas Com-*

---

[3] Application of the substantive law of the jurisdiction where the tort occurred has been the unanimously accepted rule in Michigan since *Wingert* v. *Wayne Circuit Judge* (1894), 101 Mich 395. It was applied in 1897 (*Turner* v. *St. Clair Tunnel Co.,* 111 Mich 578); 1927 (*Petrusha* v. *Korinek,* 237 Mich 583); 1933 (*Perkins* v. *Great Central Transport Corp.,* 262 Mich 616); 1935 (*Hazard* v. *Great Central Transp. Corp.,* 270 Mich 60); 1936 (*Eskovitz* v. *Berger,* 276 Mich 536); 1939 (*Kaiser* v. *North,* 292 Mich 49); 1945 (*Summar* v. *Besser Mfg. Co.,* 310 Mich 347); 1949 (*Bostrom* v. *Jennings,* 326 Mich 146); 1962 (*Goldberg* v. *Koppy Tool & Die Co.,* 365 Mich 469), and 1965 (*Griggs* v. *Griggs,* 374 Mich 268).

*pany* (1932), 285 US 393 (52 S Ct 443, 76 L Ed 815), he stood for overruling *Gillespie* v. *Oklahoma* (1922), 257 US 501 (42 S Ct 171, 66 L Ed 338), on ground, *not present here in Abendschein,* that *Gillespie's* obviously erroneous constitutional interpretation *was beyond correction by legislation* (p 406):

"*Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. Compare *National Bank* v. *Whitney* [1881], 103 US 99, 102 (26 L Ed 443, 444). This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation."

Our misgivings commence with the leading case cited, *Babcock* v. *Jackson, supra,* at 515. There it was held that New York State, where *all* of the parties resided, where the guest-host relationship arose, and where the motor trip into Ontario was to begin and end, had the necessary dominant contacts for application to the pleaded causes of New York State's law of liability. Except when the reader goes on to consider Judge Van Voorhis' dissent, the opinion of the court is impressive. Yet there is proof that the *Babcock* rule is not to be applied both ways. See *Kell* v. *Henderson* (1966), 26 App Div 2d 595 (270 NYS2d 552), where the defendants sought to plead the Ontario statute mentioned above as a defense to the plaintiff guest's suit for personal injuries sustained in New York State. All parties were residents of Ontario and the trip had been taken from Ontario with intention of returning thereto. However, the appellate division ruled 26 App Div 2d 595 (270 NYS2d at 553):

"In our view *Babcock* v. *Jackson,* 12 NY2d 473 (240 NYS2d 743, 191 NE2d 279, 95 ALR2d 1), is

inapplicable here because *Babcock* (*supra*) was not intended to and did not change the established law of the State of New York that a guest has a cause of action for personal injuries against a host in an accident occurring within this State whether those involved are residents or domiciliaries of this State or not. The very seriously injured plaintiff in this case could be prejudiced by the inclusion in the pleadings of this unwarranted affirmative defense."[4]

Mr. Sherwood, arriving at his conclusions, candidly unrolls the scroll of difficulties attendant upon *Babcock's* approach and calls accordingly for something new for application to damage actions, that is, the assessment of the "equities of the parties" and the placement of the "choice of tort law in the judge's discretion in complex cases" (62 Mich Law Rev at 1373, 1374):

"In fact, the dominant contacts principle of the *Babcock Case* is not really a choice of law rule at all, but rather an approach to the problem which has neither the advantages nor disadvantages of a rule. The new approach permits the courts to consider the contacts of States with an issue, as a prelude to deciding which relevant policies should be given effect. The results are not dictated, and the decision may be difficult. Therefore the advantages of certainty, predictability, and ease of application which a general rule would afford are undoubtedly lost. The new approach, however, provides a framework for decision in which the equities of the parties and the policies of the States are sure to be considered. The language of the new approach may prove in true conflict situations to be no more than a means by which to rationalize decisions, rather than the actual grounds of decision. But at least the courts, before

---

[4] See the attempt in *Conklin* v. *Horner* (1968), 38 Wis 2d 468, 485 (157 NW2d 579), to explain *Kell* v. *Henderson,* and quotation pp 517, 518.

reaching their results, will have had to examine many relevant considerations necessarily ignored by a mechanical rule. The new approach in effect places choice of tort law in the judge's discretion in complex cases where several states have a legitimate interest, based on contacts, in giving effect to their policies. The new approach therefore allows courts to avoid the unsatisfying results which sometimes occurred under the old *lex loci delicti* rule. However, the new approach will prove itself preferable to the old rule only if the courts are willing to demonstrate the judicial sophistication, precision, and impartiality it requires."

This is heady stuff, admittedly. But hardly any of the ominously portentous pitfalls of overrulement of cases like *Kaiser* v. *North,* some only of which have been experienced judicially since *Babcock* v. *Jackson* was trumpeted in certain law reviews, are fairly perceivable or reasonably avoidable unless, of course, we are ready to accept outright the equitable and discretionary theorems Mr. Sherwood has drawn from *Babcock* v. *Jackson* and the sons thereof. Bearing in constant mind that this case and its issue deals only with actions at law for damages arising out of motorcar (not airplane) accidents, and that no intra-family litigation is involved, it would seem that any repudiation of our standing rule *lex loci* should be made by some legislative measure which is based upon a legislatively declared policy with conditions and qualifications set forth in that measure, not by a judicial decision which turns from the known and tried to an idea, however attractive, that would authorize the trial judge to make discretionary choices, from one or indeed more of several conflicting jurisdictions, of laws he as a matter of discretion deems most equitable for application to the evidentiary proof of the "complex" case before him.

It would lengthen this opinion unnecessarily to analyze all of the opinions which, since *Babcock* v. *Jackson,* have wrestled with the precepts thereof. Nonetheless, the prudence of *stare decisis* kept always in mind, the record of some of the dilemmas created by the *Babcock-Jackson* rule will serve to explain our wary abstinence.

1. Read both opinions of *Casey* v. *Manson Construction & Engineering Company* (1967), 247 Or 274 (428 P2d 898). The action was brought by the Oregon wife of an Oregon resident for loss of consortium resulting from injuries sustained by her husband when a roadway constructed by the defendants in Washington gave way under a car tractor driven by him. Washington did not permit recovery by a wife for loss of consortium occasioned by negligent injury of her husband, but Oregon provided such a right by statute. *Babcock* v. *Jackson,* with most of its contemporaries, perforce entered the discussion. The court naturally experienced trouble with application to the facts of the new "approach" and finally selected the law of the forum. Having considered in conjunction with *Babcock* v. *Jackson* the cases of *Dym* v. *Gordon* (1965), 16 NY2d 120 (262 NYS2d 463, 209 NE2d 792) and *Macey* v. *Rozbicki* (1966), 18 NY2d 289 (274 NYS2d 591, 221 NE2d 380), the court commented:

"When *Macey* v. *Rozbicki,* which was practically on all four's with *Babcock,* came before the court, the rule of *Babcock* was reaffirmed and New York law was applied. Judge Keating, in a concurring opinion, expressed the view that *Dym* and *Babcock* could not be reconciled and that the former should be overruled. See 'Conflict of Spirit: Babcock v. Dym,' 22 Intramural Law Review 119; 'The Aftermath of Babcock,' 54 Calif L Rev 1301, 1307."

Significant footnote 5 was appended in support:

"5. *Kell* v. *Henderson* (1966), 47 Misc 2d 992 (263 NYS2d 647), aff'd 26 App Div 2d 595 (270 NYS2d 552), is illustrative of the confusion created by *Dym* v. *Gordon, supra.* The facts in the *Kell Case* were the reverse of those in *Babcock,* as the litigation grew out of an automobile trip by residents of Ontario into New York, where the accident occurred. A *nisi prius* judge, relying largely on some of the language in *Dym,* held the law of New York and not the Ontario guest statute applicable. The decision can, perhaps, be reconciled with *Babcock* and *Macey* on the basis of the New York Court of Appeals' obvious distaste for guest statutes."[5]

The concurring opinion of *Casey,* signed by Justices Holman and Goodwin, concludes with a one-paragraph remark, having to do with Restatement's recent adoption of the "dominant contacts approach."[6]

"At this time I am doubtful that I desire to be finally wedded to the methods of the second restatement as set forth in the majority opinion."

2. Not long after *Casey* was decided the Wisconsin supreme court, in *Conklin* v. *Horner, supra,* at 468, 485, determined (against understandable dissent) to apply the law of Wisconsin (seemingly contrary to its previous decision of *Wilcox* v. *Wilcox* [1965], 26 Wis 2d 617 [133 NW2d 408]). The issue was whether Illinois' "no recovery by a guest passenger absent wilful and wanton misconduct of the

---

[5] It does seem, parenthetically, that Oregon has rightly guessed that *Babcock* and *Dym* are reconcilable only on the basis of New York's determination that guest passengers should be allowed to recover, willy-nilly. The idea if sound doesn't incline one to do more than "approach" overrulement as sought by the present plaintiffs.

[6] See quotation of Restatement's current draft of section 379 in *Schwartz* v. *Schwartz* (1968), 103 Ariz 562 (447 P2d 254).

driver" law should apply to an action brought
against owner-operator Horner, by passengers
Conklin and Thurlby, for injuries sustained in Wis-
consin while all parties were on a trip from Illinois
with intent of returning to Illinois. Conklin,
Thurlby, and Horner were residents of Illinois. The
court proceeded to denominate the doctrine of
*Babcock* v. *Jackson* and new section 379 of Restate-
ment as being "the 'center of gravity', 'grouping of
contacts', 'dominant interest', 'interest oriented', or
'interest analysis' approach." Then it was alleged,
both by text and footnote,[7] that what was adopted in
*Wilcox* was "not a rule, but a method of analysis
that permitted dissection of the jural bundle con-
stituting a tort and its environment to determine
what elements therein were relevant to a reasonable
choice of law." (Which indeed is sufficient unto the
doubtful day, without suggesting any evil thereof.)

*To summarize:*

Consider all of the authorities Judge J. H. GILLIS
has cited at page 675 of *Abendschein, supra,* sift
therefrom just the motor accident cases and add
recent *Schwartz* v. *Schwartz, supra* at 521. As
against them we prefer, for this factually incom-
parable *Abendschein Case,* to heed the warning
Judge Van Voorhis wrote in *Babcock* v. *Jackson,*
notably these portions of his dissent:

"Any idea is without foundation that cases such
as the present render more uniform the laws of
torts in the several States of the United States.
Attempts to make the law or public policy of New
York State prevail over the laws and policies of

---

[7] "While we have adopted the general principle of Restatement
2d that a more rational choice-of-law rule than *lex loci* is desirable,
it is apparent that we do not follow the methodology of the Re-
statement."

other States where citizens of New York State are concerned are simply a form of extraterritoriality which can be turned against us wherever actions are brought in the courts of New York which involve citizens of other States. This is no substitute for uniform State laws or for obtaining uniformity by covering the subject by Federal law. Undoubtedly ease of travel and communication, and the increase in interstate business have rendered more awkward discrepancies between the laws of the States in many respects. But this is not a condition to be cured by introducing or extending principles of extraterritoriality, as though we were living in the days of the Roman or British Empire, when the concepts were formed that the rights of a Roman or an Englishman were so significant that they must be enforced throughout the world even where they were otherwise unlikely to be honored by 'lesser breeds without the law.' Importing the principles of extraterritoriality into the conflicts of laws between the States of the United States can only make confusion worse confounded. If extraterritoriality is to be the criterion, what would happen, for example, in case of an automobile accident where some of the passengers came from or were picked up in States or countries where causes of action against the driver were prohibited, others where gross negligence needed to be shown, some, perhaps, from States where contributory negligence and others where comparative negligence prevailed?  *  *  *

"In my view there is no overriding consideration of public policy which justifies or directs this change in the established rule or renders necessary or advisable the confusion which such a change will introduce."

A majority of the Court having voted to uphold grant in circuit of defendants' motion for summary judgment, it is ordered that the judgment of the Court of Appeals be and is hereby affirmed. Defendants will have costs of all 3 courts.

T. E. Brennan, C. J., and Dethmers, Kelly, T. M. Kavanagh, Adams, and T. G. Kavanagh, JJ., concurred.

Black, J. *(separate opinion).* In *Currie* v. *Fiting* (1965), 375 Mich 440, at 486, 487, I suggested that the Court should refrain from amending our statutes providing the right of action for wrongful death and distribution of proceeds recovered thereby (CLS 1961, § 600.2922; CL 1948, §§ 702.114, 702.115). Instead, it was proposed that the Court recognize and apply the right of the parents of deceased Linda Kay Hopkins to an action on the case bottomed upon the common-law principle laid down in *Stout* v. *Keyes* (1845), 2 Doug (Mich) 184 (43 Am Dec 465), and *Creek* v. *Laski* (1929), 248 Mich 425 (65 ALR 1113).[1] On a later occasion (*B. F. Farnell Co.* v. *Monahan* (1966), 377 Mich 552, 555, 556) we did recognize and apply those principles.

In *Creek* v. *Laski, supra* at 430, the Court adopted this definition:

"Action on the case 'is an outgrowth of the principle that, whenever the law gives a right or prohibits an injury, it will also afford a remedy. Hence, where there has been an injury for which none of the established forms of action will lie, an action on the case may be maintained, it being no

[1] Note how the text of 1 Am Jur 2d, Actions, § 22, p 560, was built principally upon these 2 Michigan cases:

"At common law, where no specific remedy is given for an injury complained of, the remedy technically known as trespass on the case, but often known as an action on the case, or simply case, may be brought. This form of remedy was devised by the courts in remote times when actions were so carefully classified that a mistake in name was generally fatal to the case, and its purpose was to cover new wrongs as they might occur so as to prevent a failure of justice. It was employed where the right to sue resulted from peculiar circumstances because of which the other forms of action gave no remedy. The action was an outgrowth of the principle that whenever the law gives a right or prohibits an injury, it will also afford a remedy."

objection that there is no precedent for the particular action, since the action is suited to every wrong and grievance that a person may suffer, and varies according to the circumstances of the case.' 11 C J p 4.";

a definition which is consistent in every respect with that of Blackstone (related in the current fourth edition of Black's Law Dictionary, p 51):

"A species of personal action of very extensive application, otherwise called 'trespass on the case,' or simply 'case,' from the circumstance of the plaintiff's whole *case or cause of complaint* being set forth at length in the original writ by which formerly it was always commenced."

As in *Currie* v. *Fiting, supra* at 487, it is recorded anew that *Stout* v. *Keyes* was employed in *Waynick* v. *Chicago's Last Department Store* (CA 7, 1959), 269 F2d 322 (77 ALR2d 1260) to provide a common-law remedy where statutes both of Illinois and Michigan, relied upon by the plaintiffs, were found deficient of "pecuniary redress for death and injuries sustained in what was evidently an appalling automobile accident."

*Waynick* exhibits a classic and visibly wholesome application of the common law of Michigan to an otherwise remediless situation. The only reason we did not employ it, as urged in *Jones* v. *Bourrie* (1963), 369 Mich 473, was that the Michigan statute there involved (CL 1948, § 436.44) *did provide* an adequate remedy for the wrong claimed, a remedy which the plaintiff proceeded to lose by statutory limitation. To make this clear the following is quoted from the unanimous opinion which Justice KELLY prepared for the Court (*Jones* v. *Bourrie* at 476):

"*Waynick* merely held that where there is no liquor control act creating a civil cause of action but there is a penal provision concerning an illegal sale, then a common-law cause of action would arise. This would not apply to the present case, as the act creates a civil cause of action."

I think the causes now before the Court deserve a fair test, as possibly permissible actions on the case, for common-law wrongs committed by one over whom the third circuit is possessed of personal as well as probably exclusive jurisdiction. Also, I think that judgments of no cause should not be entered against these plaintiffs until it is inquired into below, and then judicially ascertained, that they *do* (or did) have some available remedy, other than case, against either or both of the defendants. The error I find, then, is contagious as well as chronic. It is that which has become inherent in the fast and easy justice which GCR 1963, 116, 117 have provided since early 1963.

Certainly these causes should not have been dismissed without production and examination of the Michigan lease, on strength of which defendant Farrell obtained possession of the Dietrich-owned car and drove it toward and into New York State. The lease might—I say might—render Dietrich liable for Farrell's misdeeds without regard for the locus of commitment thereof. Too, it might render irrelevant the specific question posed by Judge Levin (*Abendschein* v. *Farrell*, 11 Mich App at 688–690); that of possible inapplicability of our owner-liability statute beyond the borders of Michigan. The same thought of evidentiary need applies to whatever fleet insurance on its cars defendant Dietrich carried at the time of this fatal accident, the provisions of which must have conformed with section 520 of the Michigan vehicle code (CLS 1961,

§ 257.520, as amended [Stat Ann 1968 Rev § 9.2220 (b)(2)]).

In short, if these plaintiffs should be able to establish, not only what seems to have been the fact of grievously causative wrongs by defendant Farrell, but also a complete want of remedy save only by resort to our common-law tenet, "no wrong without a remedy", then they should have such compensatory day in court as would be afforded had those wrongs been committed 2 hours later on the northerly half of the Ambassador Bridge.[2]

A majority of the Court does not agree with the foregoing. Accordingly, and to record a dependable precedent so far as concerns plaintiffs' motion to overrule in favor of the "dominant contacts approach," I have prepared and indorsed the foregoing opinion of the Court, marking only that this separate opinion has been appended to maintain discussional the need for wider and more comprehensive employment of Michigan's common-law provision of a right of action, on the case, whenever a wronged plaintiff has no other remedy for such wrong.

T. G. KAVANAGH, J., concurred in this separate opinion of BLACK, J.

---

[2] The Ambassador Bridge spans the Detroit river between Detroit, Michigan, on the north and Windsor, Ontario, on the south.—REPORTER.