FARRELL v FORD MOTOR COMPANY

Docket No. 132635. Submitted December 9, 1992, at Detroit. Decided
April 5, 1993, at 9:25 A.M. Leave to appeal sought.

David Farrell, administrator of the estate of Theresa Farrell,
deceased, brought a products liability action in the Wayne
Circuit Court against Ford Motor Company in connection with
the decedent's accidental death in North Carolina, which oc-
curred when the transmission of her Ford automobile, pur-
chased and registered in North Carolina, allegedly shifted from
park to reverse on its own, causing the automobile to run over
the decedent, then a resident of North Carolina. Ford, a Dela-
ware corporation with headquarters in Dearborn, Michigan,
moved for summary disposition, contending that North Caro-
lina law applied to the plaintiff's claim and that the claim was
barred under that state's six-year statute of repose. The court,
Michael L. Stacey, J., denied the motion, ruling that Michigan
law applied. Ford appealed by leave granted.

The Court of Appeals *held:*

Where a tort action in a Michigan court presents a conflict of
laws, the court must analyze the interests of each jurisdiction
in having its law govern the case. In this case, the State of
North Carolina has a substantial economic interest in extend-
ing to Ford and other manufacturers who do business in North
Carolina the benefit of its statute of repose as protection from
open-ended products liability claims. North Carolina's interest
outweighs Michigan's interest. Michigan merely serves as the
forum state and the site of Ford's headquarters. Michigan has
no interest in affording greater rights of tort recovery to a
North Carolina resident than those afforded by North Carolina.

Reversed and remanded.

CAVANAGH, P.J., concurring, stated that this case is con-

REFERENCES

Am Jur 2d, Conflict of Laws § 102.

Modern status of rule that substantive rights of parties to a tort
action are governed by the law of the place of the wrong. 29
ALR3d 603.

What law governs liability of manufacturer or seller for injury
caused by product sold. 76 ALR2d 130.

trolled by *Hampshire v Ford Motor Co,* 155 Mich App 143 (1986), despite the fact that the approach in *Hampshire* more closely resembles an analysis for dominant contacts rather than governmental interest.

CONFLICT OF LAWS — TORT ACTIONS.

A conflict of laws presented in a tort action in a Michigan court is resolved through an analysis of the interests of each jurisdiction in having its law govern the case; the law that should apply is that of the jurisdiction whose interests substantially outweigh those of others.

*Goodman, Lister, Seikaly & Peters, P.C.* (by *Richard M. Goodman, Darrel Peters,* and *Thomas W. Stephens*) (*Robert A. Sedler,* Of Counsel), for the plaintiff.

*John M. Thomas,* and *Dickinson, Wright, Moon, Van Dusen & Freeman* (by *John E.S. Scott* and *Jerry L. Johnson*), for the defendant.

Before: CAVANAGH, P.J., and MACKENZIE and GRIFFIN, JJ.

GRIFFIN, J. This appeal stems from a products liability action filed in the Wayne Circuit Court. Plaintiff, an administrator of a North Carolina decedent's estate, seeks to recover wrongful-death damages arising from an accident involving an allegedly defective Ford automobile purchased and registered in North Carolina. The accident occurred in Winston-Salem, North Carolina, and took the life of a North Carolina resident. Ford Motor Company is a Delaware corporation whose world headquarters are located in Michigan. The issue before us is whether Michigan law or North Carolina law governs this lawsuit. We apply Michigan's interest-analysis rule regarding choice of law, and hold that North Carolina law applies. Accordingly, we reverse the decision of the circuit court, which held that Michigan law applied.

I

On December 5, 1988, plaintiff's decedent, Theresa Farrell, a resident of North Carolina, was killed in an automobile accident in North Carolina. According to plaintiff's complaint, decedent was crushed to death when the transmission of her 1980 Ford LTD station wagon slipped out of park and into reverse gear, backing over her.

The instant lawsuit against Ford was filed in the Wayne Circuit Court on February 1, 1990. In his complaint, plaintiff asserted liability against Ford on various theories, including negligence, gross negligence, and breach of warranty. Ford answered the complaint, and on June 27, 1990, filed a motion for summary disposition. Ford argued in part that North Carolina law governed this case and that plaintiff's claim was time-barred pursuant to North Carolina's six-year statute of repose applicable to products liability actions. NC Gen Stat § 1-50(6).

Following a hearing, the circuit court denied defendant's motion. The circuit court held that Michigan law, rather than North Carolina, law would apply to plaintiff's claim. The court's ruling was based on the recent decision of the United States Court of Appeals for the Sixth Circuit in *Mahne v Ford Motor Co,* 900 F2d 83 (CA 6, 1990), which, on similar facts, held that Michigan law would apply. By order dated November 30, 1990, we granted defendant's application for leave to appeal.

II

On appeal, defendant contends that the circuit court's ruling was in error. Defendant argues that Michigan's choice-of-law rule compels the conclu-

sion that North Carolina law rather than Michigan law governs this lawsuit. Specifically, defendant contends that North Carolina has a significant interest in having its law applied to the facts of this case, whereas Michigan has no comparable interest in applying its law. In addition, defendant submits that *Mahne, supra,* the case relied on by the trial court, was wrongly decided. After thorough review, we agree with defendant's argument.

### III

The history of Michigan's choice-of-law rule was outlined by Justice WILLIAMS in his plurality opinion in *Sexton v Ryder Truck Rental, Inc,* 413 Mich 406, 419-423; 320 NW2d 843 (1982):

> For a great many years, Michigan embraced the Bealeian conflict-of-laws notion that when a cause of action is maintained for injury sustained in a foreign jurisdiction, the substantive rights of the parties are to be automatically fixed and governed by the law of the place where the wrong occurred[3] —the *lex loci delicti.* In support of this rule, courts in Michigan as well as other jurisdictions have largely relied on the teachings of the original Restatement Conflict of Laws, and particularly § 378 of that treatise which states: "The law of the place of wrong determines whether a person has sustained a legal injury." "The place of wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place." *Id.,* § 377.
>
> The traditional advantages advanced on behalf of the *lex loci* rule have included discouraging forum shopping and furthering the goals of certainty and predictability through its ease of application, thus simplifying the task of both lawyers and the courts.
>
> Despite these reputed advantages, modern scholars and about half or more of the states have

rejected its rigidity since the rule often produced
obvious rather than just results through its failure
to consider the interests of other jurisdictions in
the litigated matter.

[3] Application of the substantive law of the jurisdiction where
the tort occurred has been the unanimously accepted rule in
Michigan from 1894 to 1969, beginning with *Wingert v Wayne
Circuit Judge,* 101 Mich 395; 59 NW 662 (1894). It was applied
in 1897 (*Turner v St Clair Tunnel Co,* 111 Mich 578, 584; 70
NW 146 [1897]); 1927 (*Petrusha v Korinek,* 237 Mich 583, 589-
590; 213 NW 188 [1927]; 1933 (*Perkins v Great Central Trans-
port Corp,* 262 Mich 616, 619-620; 247 NW 759 [1933]); 1935
(*Hazard v Great Central Transport Corp,* 270 Mich 60, 71; 258
NW 210 [1935]); 1936 (*Eskovitz v Berger,* 276 Mich 536, 540;
268 NW 883 [1936]); 1939 (*Kaiser v North,* 292 Mich 49, 54; 289
NW 325 [1939]); 1945 (*Summar v Besser Mfg Co,* 310 Mich 347,
352; 17 NW2d 209 [1945]); 1949 (*Bostrom v Jennings,* 326 Mich
146, 151; 40 NW2d 97 [1949]); 1962 (*Goldberg v Koppy Tool &
Die Co,* 365 Mich 469, 472; 113 NW2d 770 [1962]); 1965 (*Griggs
v Griggs,* 374 Mich 268, 270; 132 NW2d 163 [1965]); and, most
significantly, 1969 (*Abendschein v Farrell,* 382 Mich 510, 516;
170 NW2d 137 [1969]).

The retreat by the Supreme Court from its lex
loci delicti approach began in *Sweeney v Sweeney,*
402 Mich 234; 262 NW2d 625 (1978). In *Sweeney,*
the Court established an exception to lex loci
delicti for reasons of public policy. The narrow
issue resolved in *Sweeney* was whether two Michi-
gan family members involved in a single-car acci-
dent in Ohio should be bound by Ohio law with
regard to intrafamily immunity or whether Michi-
gan's law should apply. In deciding in favor of the
application of Michigan law to the Michigan liti-
gants, the Supreme Court held:

The state of residence has a substantial interest
in the parent-child legal relationship. Michigan's
announced public policy is to permit a child "to
maintain a lawsuit against his parent for injuries
suffered as a result of the alleged ordinary negli-
gence of the parent". That public policy should
apply to Michigan residents suing in Michigan

courts even though the alleged negligence occurred in Ohio.

Automatic application of *lex loci delicti* in this daughter against father suit would frustrate an announced Michigan public policy. Whether *lex loci delicti* should be applied in other situations is not decided here. [*Id.* at 242.]

The next choice-of-law case decided by the Supreme Court was *Sexton, supra.* Although no opinion of the Court was rendered, a majority of the justices in separate opinions by Justices WILLIAMS, T.G. KAVANAGH, and LEVIN agreed to abandon the rule of lex loci delicti and to overrule *Abendschein v Farrell,* 382 Mich 510; 170 NW2d 137 (1969). However, the *Sexton* Court did not establish a new rule for choice of law.

The most recent pronouncement by the Supreme Court on choice of law is *Olmstead v Anderson,* 428 Mich 1; 400 NW2d 292 (1987). In *Olmstead,* the Court continued to decide issues of choice of law case by case and again failed to adopt a comprehensive choice-of-law methodology. See *In re Disaster at Detroit Metro Airport,* 750 F Supp 793, 797 (ED Mich, 1989). The holding of *Olmstead* is that the law of the forum (lex fori) should be applied unless there is a "rational reason" to displace it. Finding no such reason in *Olmstead,* the Supreme Court found it unnecessary to take the next step, which would be to resolve the conflict of laws.

Professor Robert Allen Sedler, who serves as cocounsel for the plaintiff in this appeal, has summarized in Sedler, *Choice of Law In Michigan: A Time to Go Modern,* 24 Wayne L R 829, 833 (1978), the modern choice-of-law methodologies as follows:

While academic commentators have long agreed that the traditional approach [lex loci delicti]

should be abandoned, they have sharply disagreed over what approach should be adopted in its stead. The same disagreement was reflected in judicial decisions when *Abendschein* was decided. As in *Abendschein,* lawyers arguing for the abandonment of the traditional approach tended to urge replacement by the "state of the most significant relationship" approach of the Restatement (Second) of Conflict of Laws; this approach had been explicitly adopted by a number of courts at that time. The most influential academic approach, however, appeared to be Currie's interest analysis, which based the choice of law decision on the policies reflected in the laws of the involved states and the interest of each state, in light of those policies, in having its law applied on the point in issue.[22] Some courts expressly followed Currie's approach;[23] some followed Leflar's approach of choice-influencing considerations,[24] some were more eclectic, looking to different approaches which would support the particular result they desired to reach.[25]

---

[22] Currie's major articles have been collected in a book, B. Currie, *Selected Essays on the Conflict of Laws* (1963).

[23] See, e.g., *Reich v Purcell,* 67 Cal 2d 551; 432 P2d 727; 63 Cal Rptr 31 (1967); *Melk v Sarahson,* 49 NJ 226; 229 A2d 625 (1967); *Tooker v Lopez,* 24 NY2d 569; 249 NE2d 394; 301 NYS2d 519 (1969). New York's adherence to interest analysis was sharply curtailed in favor of "narrow, policy-based rules" in *Neumeier v Kuehner,* 31 NY2d 121; 286 NE2d 454; 335 NYS2d 64 (1972).

[24] See, e.g., *Clark v Clark,* 107 NH 351; 222 A2d 305 (1966); *Woodward v Stewart,* 104 RI 290; 243 A2d 917, cert dismissed, 393 US 957 (1968); *Conklin v Horner,* 38 Wis 2d 468; 157 NW2d 579 (1968). As to Leflar's approach see generally, Leflar, *Choice-Influencing Considerations in Conflicts Law,* 41 NYU L R 267 (1966); *Conflicts Laws: More on Choice-Influencing Considerations,* 54 Calif L R 1584 (1966).

[25] See, e.g., *Wessling v Paris,* 417 SW2d 259 (Ky, 1967); *Balts v Balts,* 273 Minn 419; 142 NW2d 66 (1966).

---

Although the Supreme Court has neither accepted nor rejected the various modern approaches, it has discussed with apparent approval the interest-analysis approach adopted by this

Court. See *Olmstead, supra* at 21-23. Further, the Court has expressed its disfavor of result-oriented forum shopping:

> The concern surrounding forum shopping stems from the fear that a plaintiff will be able to determine the outcome of a case simply by choosing the forum in which to bring the suit. Presumably, plaintiffs will bring suit in the forum whose law is the most advantageous. In so doing, the plaintiff may be attempting to obtain a favorable result simply by choosing the right forum . . . . [*Olmstead, supra* at 26.]

IV

This brings us to our decision in *Hampshire v Ford Motor Co,* 155 Mich App 143; 399 NW2d 36 (1986), which we find dispositive. In *Hampshire,* a California resident, while driving in California, sustained severe injuries when he was struck head-on by an automobile manufactured by Ford Motor Company. At the time of the accident, the Ford automobile was stolen. The plaintiff brought an action against Ford in Michigan, alleging that Ford had negligently designed the ignition-locking system on its vehicles, thus making its cars easier to steal than other cars. *Id.* at 145.

Before reaching the question whether Ford was properly awarded summary disposition, this Court first had to address whether Michigan or California law applied to the plaintiff's cause of action. Employing an interest-weighing analysis, this Court held that California law was applicable to the plaintiff's claim:

> In this case, a superior foreign state interest exists which calls for the application of foreign law in order to reach a just resolution of the contro-

versy. Michigan has no significant interest in this litigation. The plaintiff was a resident living in California at the time of the accident and has never resided in Michigan. The accident occurred in California and the Ford vehicle involved was registered and licensed in California. The connections to Michigan are limited to the fact that Ford's headquarters are located in Michigan and the action was filed in this state. [*Hampshire, supra* at 146-147.]

Despite plaintiff's argument to the contrary, we find *Hampshire* persuasive and controlling. Plaintiff's attempts to distinguish *Hampshire* are unavailing.

On January 26, 1987, the Supreme Court denied leave to appeal in *Hampshire.* 428 Mich 852 (1987). Eleven days later, the Supreme Court released its opinion in *Olmstead v Anderson, supra.* Plaintiff's argument that *Olmstead* impliedly overrules or supersedes *Hampshire* is without merit. As outlined above, *Olmstead* does not establish a new choice-of-law methodology at odds with *Hampshire.* On the contrary, the limited holding of *Olmstead* is entirely consistent with *Hampshire.*

The Supreme Court's opinion in *Olmstead, supra* at 21-23, contains an extensive discussion of *Hampshire.* The Court characterizes the *Hampshire* interest-analysis approach as both the "trend" and the "majority" position. If anything is to be read into *Olmstead* with regard to *Hampshire,* it is tacit approval, not disapproval. Although the Supreme Court has not yet deemed it necessary to balance respective state interests, we believe that in appropriate future cases it will do so. Further, we are confident that the interest-analysis methodology adopted by this Court in *Hampshire* will be the approach accepted by the Supreme Court.

V

The present controversy was fostered by the errant decision of the Sixth Circuit Court of Appeals in *Mahne, supra.* Like *Hampshire, supra,* the facts in *Mahne* are nearly indistinguishable from those involved in the case at bar. In *Mahne,* a fifteen-year-old Florida resident was severely burned when a 1967 Ford Mustang in which she was riding was hit in the rear and burst into flames. The accident occurred in Florida and suit was ultimately filed against Ford in federal court in Michigan. In her lawsuit, the plaintiff alleged that Ford breached an implied warranty of fitness and negligently designed, manufactured, and tested the Mustang's fuel system and rear-end structure. *Mahne, supra* at 84-85.

Ford filed a motion to dismiss, arguing that Florida law applied and that the plaintiff's suit was barred by Florida's then applicable twelve-year statute of repose. Relying on this Court's decision in *Hampshire, supra,* the district court agreed with Ford's argument and granted its motion to dismiss. *Mahne, supra* at 85.

On appeal, the United States Court of Appeals for the Sixth Circuit refused to follow *Hampshire.* Purporting to apply a new rule of law adopted in *Olmstead,* the court reversed, holding that there was no interest on the part of Florida that would justify displacing Michigan law. *Id.* at 88-89. The basis for this conclusion was the court's assumption that Florida's statute of repose was intended to apply solely to defendants who operated manufacturing facilities within the borders of the State of Florida. The court reasoned:

The Florida statute of repose in effect at the time of plaintiff's accident provides:

"Actions for products liability . . . must be be-
gun within the period prescribed by this chapter
. . . *but in any event within twelve years after the
date of delivery of the completed product to its
original purchaser . . .* , regardless of the date the
defect in the product . . . was or should have been
discovered." (Emphasis added.)

Although legislative history concerning the stat-
ute is scarce, it was presumably designed to pro-
tect Florida manufacturers from liability for inju-
ries caused by products which had been on the
market for over twelve years. 11 Nova L. J. 849,
852 (1987).

Defendant argues that Florida's statute of re-
pose applies because Florida is where plaintiff
resides, the vehicle was licensed, the accident oc-
curred, and the injuries sustained. Moreover, de-
fendant points out that it does business in Florida.
However, if applied, the Florida statute of repose
would not benefit the interest it was designed to
protect. Instead of protecting a Florida manufac-
turer as intended, the statute of repose would
protect an out-of-state manufacturer at the ex-
pense of a Florida resident.

Plainly, the Florida statute does not benefit
plaintiff, a Florida resident, under the circum-
stances of this case since the statute would bar her
action against a nonresident defendant whose own
state law, the law of Michigan, affords no similar
protection for a manufacturer. *Olmstead, supra* at
29, 400 NW2d 292. Further, defendants cannot
argue that applying Michigan law would defeat
their expectations since the individual defendants
reside there and defending Ford Motor Company
has its headquarters in that state. *Olmstead, supra*
at 27, 400 NW2d 292. Thus, there is simply no
reason to extend the benefits of the Florida statute
of repose to the Michigan defendants. Since Flor-
ida has no interest in having its statute of repose
applied, Michigan law applies without regard to
the nature or quality of Michigan's interest. *Olm-
stead, supra* at 30, 400 NW2d 292.

We hold, therefore, that since there is no ra-

tional reason to displace Michigan law, the presumptive *lex fori* rule directs that Michigan law governs the case. [*Mahne, supra* at 88-89.]

VI

As noted above, the Wayne Circuit Court denied defendant's motion for summary disposition solely on the basis of the decision in *Mahne*.[1] In this appeal, defendant maintains that, contrary to the conclusion in *Mahne,* North Carolina has a substantial economic interest in affording manufacturers who do business in North Carolina the benefit of its statute of repose. Defendant submits that this substantial interest is superior to any interest Michigan might have in this litigation, which seeks solely to compensate a North Carolina resident for an accident that occurred in North Carolina.

In response, plaintiff argues that the analysis in *Mahne* is correct. Plaintiff contends that because the policy behind the statute of repose is to protect manufacturers from "open-ended" liability stemming from the manufacture or design of their products, the only reasonable interest North Carolina can assert is the protection of those who conduct manufacturing and design activities within its borders. According to plaintiff, Ford has no such facilities in North Carolina and thus North Carolina has no interest in applying its law

---

[1] Plaintiff places undue emphasis on the fact that the author of *Mahne* is Judge James L. Ryan, a former justice of the Michigan Supreme Court. Judge Ryan was not part of the WILLIAMS-T.G. KAVANAGH-LEVIN plurality in *Sexton, supra,* but rather a dissenter who favored the retention of lex loci delicti and reaffirmation of *Abendschein v Farrell, supra.* He was not a member of the Michigan Supreme Court when *Olmstead* was decided.

for the protection of Ford.[2] This argument appears in essence to be that which proved successful in *Mahne, supra.*

After thorough review, we are satisfied that North Carolina has an obvious and substantial interest in shielding Ford from open-ended products liability claims. Ford unquestionably generates substantial commerce within the State of North Carolina. In connection with its motion for summary disposition, Ford submitted substantial documentary evidence in the form of affidavits that reveal that Ford directly employs seventy employees at its Charlotte, North Carolina, facility and purchased nearly $591 million worth of materials from North Carolina suppliers in 1989. In addition, Ford and Lincoln-Mercury vehicles accounted for 27.4 percent of all new cars and 30 percent of new trucks sold in North Carolina in 1989. It is obviously in North Carolina's economic interest to encourage manufacturers, such as Ford, to do business in North Carolina. The sales taxes collected, salaries paid, and materials purchased all contribute to North Carolina's economy. The presence of a Ford manufacturing plant within the borders of North Carolina is not dispositive with regard to the economic interests at issue.

In his brief, plaintiff concedes that the obvious purpose behind the statute of repose is to "protect defendants from product liability claims after a period of time has elapsed from the date of delivery, and to this extent, to reduce their exposure to such claims." We simply fail to see how this policy is rendered any less compelling solely by virtue of the fact that defendant does not have a manufacturing plant located in the State of North Carolina. On the contrary, we agree with defendant

[2] We question, but do not decide, whether such disparate treatment would survive constitutional scrutiny on equal protection grounds.

that its substantial business dealings with the citizens of North Carolina gives North Carolina a substantial interest in encouraging more commercial activity and in affording defendant the protection provided by that state's statute of repose. See generally *In re Disaster at Metro Airport, supra* at 807.

While North Carolina has a substantial interest in applying its law, Michigan has little or no interest in this North Carolina accident involving a North Carolina resident. Michigan has no interest in affording greater rights of tort recovery to a North Carolina resident than those afforded by North Carolina. See *Seals v Langston Co,* 206 NJ Super 408, 412; 502 A2d 1185 (1986). Michigan is merely the forum state and situs of defendant's headquarters.[3] Such minimal interests are insufficient to justify the result-oriented forum shopping that has been attempted.

### VII

After balancing the respective state interests, we hold that North Carolina law applies and that the circuit court erred in concluding otherwise. Accordingly, we reverse the decision of the circuit court and remand this case for further proceedings. Defendant's second issue, concerning the effect of Michigan's borrowing statute, MCL 600.5861; MSA 27A.5861, is now moot.

Reversed and remanded. We do not retain jurisdiction.

---

[3] Plaintiff also alleges in his appeal that "the vehicle was manufactured, at least in part, in Michigan" and that "all the facts relating to the design of the 1980 Ford LTD occurred in Michigan." These allegations are not contained in plaintiff's complaint, nor are we directed to record evidence that supports them. Even if we were to assume the truth of these allegations, our analysis and disposition would not change.

MACKENZIE, J., concurred.

CAVANAGH, P.J. *(concurring).* Although I question our approach in *Hampshire v Ford Motor Co,* 155 Mich App 143; 399 NW2d 36 (1986), an approach that I believe more closely resembles "dominant contacts" than "governmental_interest" analysis, I concur in the result reached in this case because the luxury of questioning and disregarding an opinion of this Court is not one I am willing to share with the trial court.